Russell M. Yankwitt
Craig M. Cepler
Yankwitt LLP
140 Grand Street
White Plains, NY 10601
Phone: (914) 686-1500
Fax: (914)-801-5930

Paul Fields
Cameron S. Reuber
LEASON ELLIS LLP
One Barker Avenue, Fifth Floor
White Plains, New York 10601
Phone: (914) 288-0022
Fax: 914-288-0023

*Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| TRIBORO QUILT MANUFACTURING CORPORATION,<br><br>*Plaintiff*,<br><br>-v-<br><br>LUVE LLC,<br><br>*Defendant*. | Civil Action: 7:10-cv-03604 (VB) |

**PLAINTIFF'S TRIAL MEMORANDUM**

Plaintiff Triboro Quilt Manufacturing Corporation ("Plaintiff" or "Triboro") hereby

submits this Trial Memorandum concerning the claims of Luve, LLC ("Luve") to be tried on

January 5, 2014.[1]

---

[1] For the sake of convenience and economy, Triboro shall reference any Docket Entries cited herein pursuant to the following citation format: "*Dkt.* __".

# <u>TABLE OF CONTENTS</u>

**PAGE**

I.     PRELIMINARY STATEMENT                                                                      1

II.    GENERAL BACKGROUND                                                                       2

    A.    Triboro Agrees to License the Prospective Patent Before It Issues ........................ 2
    B.    Triboro and Luve Collaborate On Products Not Covered by the ELA .................... 6
    C.    Luve's Patent Application Is Rejected by the U.S. Patent Office ........................... 8
    D.    The Instant Litigation ................................................................................. 9

III.   CAUSES OF ACTION                                                                         10

    A.    Luve Cannot Prove Any Damages Resulting From Breach of Contract .............. 10
        1.    The ELA Does Not Require Triboro to Maximize Sales of a Specific Brand of Bath Blanket or Maximize the Value of a Trademark (§§ 6.1, 12.2.4) ....................................................... 11
        2.    Luve Cannot Prove Any Damages Related to Two Inadvertent Marking Omissions as Required by ELA § 7.2 ........................................ 13
        3.    Luve Cannot Prove Any Damages Pursuant to ELA § 7.1 Deriving From Lost Opportunities to Review Certain Products Prior to Their Sale ................................................................................................. 14
        4.    Luve Cannot Prove Any Damages Resulting From Non-Receipt of Some Marketing Reports Required by ELA § 3.2.4 ................................. 15
    B.    Luve Cannot Sustain a Claim for Misappropriation ............................................. 15
        1.    Legal Relationship ................................................................................. 16
        2.    Luve Cannot Satisfy the Novelty Requirement ..................................... 17
    C.    Luve Cannot Sustain a Claim for Conversion ...................................................... 19
    D.    Luve Cannot Maintain a Claim for Unjust Enrichment ........................................ 20
    E.    Triboro's Breach of Contract/Wrongful Termination Claim ................................. 21

IV.    DAMAGES                                                                                  21

    A.    Rule 26 bars Luve From Presenting an Unsupported, Deficient Damage Claim ...................................................................................................................... 21
    B.    Luve's Damage Theories Are Inherently Deficient and Legally Defective .......... 25

V.     CONCLUSION                                                                               27

# TABLE OF AUTHORITIES

**FEDERAL CASES**                                                          **PAGE(S)**

Chamilia, LLC v. Pandora Jewelry, LLC
No. 04-CV-6017 (KMK), 2007 WL 2781246 (S.D.N.Y. Sept. 24, 2007)…………………..……14

Design Strategy, Inc. v. Davis
469 F.3d 284 (2d Cir. 2006)……………………………………………………………..……24

Faiveley Transp. Malmo AB v. Wabtec Corp.
559 F.3d 110 (2d Cir. 2009)………………………………………………………………...16

Ferring B.V. v. Allergan, Inc.
4 F. Supp. 3d 612 (S.D.N.Y. 2014)…………………………………………………...…20

Galli v. Metz
973 F.2d 145 (2d Cir.1992)……………………………………………………………...…12

LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp.
424 F.3d 195 (2d Cir. 2005)…………………………………………………………...…12

McGhan v. Ebersol
608 F. Supp. 277 (S.D.N.Y. 1985)…………………………………………………………16

Murray v. Town of Stratford
No. 3:11 CV 629 (JGM), 2014 WL 3700982 (D. Conn. July 25, 2014)………………………..24

Pure Power Boot Camp, Inc. v. Warrior Fitness Boot Camp, LLC
813 F. Supp. 2d 489 (S.D.N.Y. 2011)……………………………………………….…20, 23

Seaweed, Inc. v. DMA Product & Design, LLC
219 F.Supp.2d 551 (S.D.N.Y. 2002)……………………………………………………….3, 19

Zikakis v. Staubach Retail Servs., Inc.
No. 04 CIV. 9609 (NRB), 2005 WL 2347852 (S.D.N.Y. Sept. 26, 2005)……………...…16, 17

**STATE CASES**

Burr v. Lichtenheim
190 Conn. 351, 460 A.2d 1290 (1983)……………………………………………………..25

Columbus Park Corp. v. Dep't of Hous. Pres. & Dev. of City of New York
80 N.Y.2d 19 (1992)………………………………………………………………………..12

<u>Conaway v. Prestia</u>
191 Conn. 484, 464 A.2d 847 (1983)…………………………………………………………25

<u>Downey v. General Foods Corp.</u>
31 N.Y.2d 56 (1972)…………………………………………………………..……………17

<u>Educ. Sales Programs, Inc. v. Dreyfus Corp.</u>
317 N.Y.S.2d 840 (Sup. Ct. 1970)………………………………………………….………18

<u>Gargano v. Heyman</u>
203 Conn. 616, 525 A.2d 1343 (1987)………………………………………………...……25

<u>Marraccini v. Bertelsmann Music Group Inc.</u>
221 A.D.2d 95 (3d Dep't 1996)………………………………………………….…………18

**STATUTES**

Fed.R.Civ.P. 26(a)(1)(c)……………………………………………………….………24, 25

35 U.S.C. § 102……………………………………………………………….…..…8

35 U.S.C. § 292(a)………………………………………………………………………14

I.      PRELIMINARY STATEMENT

This is a breach of contract case arising out of a licensing agreement for a single, unpatented product.  The evidence will show that the claimant, Luve, suffered no actual damages in connection with its contract claim and that its secondary claims of unjust enrichment, conversion, and misappropriation are meritless.

With respect to its contract claim, Luve cannot show any damages because Triboro has paid (and continues to pay) <u>all of the monies due and payable pursuant to the agreement</u>. Moreover, despite Luve being a start-up sole proprietorship whose annual revenue averages only around $25,000 (almost all of which derives from Triboro royalties), Luve somehow estimates that its breach of contract damages are 100-fold greater than its annual revenue, *i.e.,* $2,738,490, including $1,377,829 for "lost historic profits" and $1,360,661 "lost future opportunities."  The contract-at-issue, however, does not entitle Luve to "profits" – it only provides for Luve to receive 5% of all sales of a single product, regardless of how the product is marketed, packaged or branded.  As for "future opportunities," the evidence will show that none can exist for this unpatented product, which, as a matter of law, anyone can make without owing Luve a dime.

Luve's secondary claims are equally meritless and each one's multi-million damage demand (collectively totaling more than $20 million) is contrived without reference to its merits or governing law.  Each one is premised entirely on the unsupportable allegations of Luve's only principal, Amy Seckinger (a novice designer), that Triboro misappropriated and commercialized her "ideas" for, *inter alia*, a Better Bath product line without compensating her.  Beyond the licensed bath blanket, an idea found to be not novel by the objective patent examiner, Seckinger's various other "ideas" for the line are not only well-known to the trade (some for decades), but her "ideas" were not even her own.  She simply co-opted the product designs of various high-end retailers.

## II.     GENERAL BACKGROUND

Plaintiff Triboro is a local business that has been in operation for more than 80 years designing, manufacturing, and marketing bedding, bath, apparel and safety products for infants for resale to retailers (among which are included Target, Babies "R" Us, Kohl's, *etc*.). *See Dkt*. 1.

Defendant Luve is a Wisconsin sole-proprietor LLC, whose principal, Amy Seckinger alleged she "creates and designs products that assist in caring for babies." *See Dkt*. 9, Luve Answer, at § 5.  Before partnering with Triboro, Luve had never designed, manufactured, or sold products of any kind. Indeed, Seckinger has no formal training, knowledge, or experience with regard to the bedding, bath, and apparel industry (or consumer products in general).

In 2006, Luve brought a potentially patentable product idea to Triboro that it believed had commercial merit. Shown below, the product is a bath blanket (also called a "Bath Luve"):



The bath blanket product is a functional item for use in the bathing of infants, and is used similarly to a washcloth or a towel.  The product absorbs warm water and is draped over the infant's torso.

### A.     Triboro Agrees to License the Prospective Patent Before It Issues

In 2006, there was no comparable product like the bath blanket on the market, which led the parties to believe it *may* be patentable (*i.e.,* that exclusive rights to make, use, and sell could be granted by the U.S. Patent Office). Obtaining a patent, however, is a long and difficult process and Triboro did not want to invest resources into marketing a product it could ultimately be precluded from marketing if, years into the sales and marketing process, a patent issued to Luve.

Notably, because Luve did not have a patent[2] or any manner of enforceable intellectual property rights to the bath blanket product (or, indeed, any product), Triboro *could* have lawfully acted pursuant to standard industry practice and performed an "at-risk" launch of a similar bath blanket product, *before* a patent issued to Luve (if ever).[3]

Here, however, the evidence at trial will show that Triboro declined an "at-risk" launch in favor of entering into an Exclusive License Agreement ("ELA") with Luve concerning the bath blanket (*i.e.,* the "Licensed Product" per ELA § 1.5) in August 2006.  The ELA provides, *inter alia*, that Luve will receive five percent (5%) of net sales of the bath blankets sold by Triboro. ELA § 3.2.1(a).  To date, Luve has received approximately $150,000 in royalties.

In light of the fact that Luve had no knowledge or experience marketing products to retailers, the ELA expressly states that Triboro, at its sole discretion, shall have full operational control and authority concerning the design, manufacture, marketing, distribution, and sale of any and all bath blankets subject to Luve's patent application.

Also, because Triboro had already established a market for its recognized brands with respect to many of its products, and was aware from prior marketing experience that many chain

---

[2] *See Seaweed, Inc. v. DMA Product & Design, LLC*, 219 F.Supp.2d 551, 556 (S.D.N.Y. 2002) ("There is no action for patent infringement prior to the issuance of a patent.").

[3] "At-risk" product launches are commonplace because it generally takes anywhere from two to four years for a patent application to mature into a patent, if ever.  During such time, as the Patent Office decided whether Luve would be entitled to a patent on the blanket, the subject-matter of the patent application can be lawfully copied and sold at will.  Patent applicants (like Luve) seeking to generate revenue from their potentially patentable product ideas during the pendency of patent applications are therefore incentivized to enter into license agreements, as was done here, whereby a manufacturer with existing relationships with retailers (like Triboro) agrees to compensate the putative patentee so as to avoid selling "at-risk" products.   Such arrangements provide a "win-win" scenario for both manufacturers and would-be patentees because the manufacturers can assure risk-adverse retailers that no patent infringement liability exists (thus increasing the likelihood of retailers agreeing to carry the product) and the would-be patentees can begin commercializing their products before the U.S. Patent Office grants them exclusive rights (thus allowing would-be patentees to monetize their potentially patentable ideas before receiving said rights).  Also, as happened here, the putative patentee can receive some revenue for an "idea" that turns out to be worthless (*i.e.,* free for anyone to commercialize).

stores demanded private label brands for their lines of goods, Triboro wanted absolute control

over the marketing of the bath blanket.  Thus:

> "Triboro, <u>at its sole discretion</u>, shall manufacture, market, distribute and sell the Licensed Product, including selecting <u>any trademarks</u> or copyrightable materials to use in connection with such products, <u>the design, merchandising and packaging</u> of such products and ensuring quality control for each such product. […] <u>The final determination of product, packaging and promotional material rests solely with Triboro.</u>"

ELA § 7.1 (emphasis added).  The bath blankets were designed to resemble various animals

(ducks, frogs, fish, *etc*.), which is a longstanding, commonplace marketing motif in the baby

products industry.  Triboro collaborated with Seckinger to create a Luve-branded product line

that could be sold to consumers directly via Luve's website or to retailers nationwide through

Triboro.  A photograph of the Luve product line developed with Triboro is shown below:



In addition, Triboro exercised its contractual right to independently create other bath blankets,

without Luve's collaboration or creative contribution, but for which Triboro continued to pay

Luve a 5% royalty. Photographs of some of the independently designed bath blankets are below:



Additionally, as Luve had never sold any products to consumers prior to executing the ELA and had no established brand name at the time of execution, Triboro agreed to assist Luve in procuring a trademark registration for its brand name from the U.S. Trademark Office.  *See* ELA 6.1.  Nevertheless, Triboro did <u>not</u> agree to sell only Luve-branded bath blankets (which Luve now contends is required by the ELA).  Instead, Triboro secured the right, at its sole discretion, to sell products using whatever trademarks, brand names, and packaging (also known as "trade dress") it deemed appropriate:

> "Triboro shall, in its sole discretion, select the brand names, slogans, trade dress or other indicia of origin to be used in connection with the sale of Licensed Products thereon."  ELA § 6.2 (emphasis added).

This provision, which allowed Triboro to independently design products to cater to marketplace demand, enabled Triboro to maximize the sale of the bath blanket to retailers, thereby maximizing the total royalty received by Luve.  Triboro, like most manufacturers, recognized that use of a known brand name assured a certain quality in a product, much like the reason people purchase an iPhone rather than an unknown brand of cellphone.  It is only natural that customers already familiar with Triboro's brands would tend to purchase new additions to the brand instead of purchasing the same item with an unrecognized brand.

Moreover, if a chain retail customer like Target offered to buy either 1,000 bath blankets branded with one mark or 10,000 bath blankets branded with Target's house mark (*e.g.,* CIRCO®), the ELA enables Triboro to accept the larger sale as the additional revenue benefits both Luve and Triboro.  Similarly, as noted above, if a retailer was unwilling to stock a new brand without an established market presence (*e.g.,* Luve's BATH LUVE®), but instead willing to add the bath blanket to a line already sitting on its shelves (*e.g.,* Triboro's JUST BORN®), the ELA enables Triboro to accept the sale rather than forgo it altogether.

Ultimately, Triboro used various different trademarks, brand names, product designs, and product packaging to maximize the sale of bath blankets by securing sales to several mass market retailers such as Wal-Mart, Target, Babies "R" Us, and Kohl's.  Luve was paid the exact same amount of royalties regardless of the brand name used to market the bath blanket to consumers.  As a result of Triboro's efforts, Luve became a revenue-generating venture virtually overnight.  This success came about, in part, due to Triboro's ability to sell the bath blanket as part of several established brands as opposed to one, new unestablished brand (*i.e.,* Bath Luve).

### B.    Triboro and Luve Collaborate On Products Not Covered by the ELA

During the term of the ELA, Triboro and Luve worked to design additional products that could be sold along with the bath blankets in line with an age-old sales practice to market a collection of different, but related, products together so that consumers are motivated to purchase more than one product in the collection.   In the children's bath product space, coordinated products generally comprise, *inter alia*, towels, wash-cloths, robes, slippers, and bath toys.

Triboro and Luve collaborated on a product line collection of terry robes, slippers, towels and wash-cloths with the bath blanket as the centerpiece, which were designed to coordinate by virtue of blue, yellow, or green gingham trim.  Below is a photograph of products coordinated to match the blue fish:



Luve's "contributions" to this product line (with the sole exception of the bath blanket), either constituted (i) banal modifications to Triboro's existing product designs, compositions, and configurations of towels, wash-cloths, robes, slippers (*e.g.,* swapping out monochromatic trim in favor of gingham trim, swapping out one kind of terrycloth for another, *etc.*), or (ii) outright knockoffs of existing products sold by third-parties. Specifically, Seckinger trolled the marketplace for existing products marketed by third-party retailers (e.*g.,* Pottery Barn) that could be sold as companion products to the bath blankets and, after "cherry-picking" the various design elements that she favored from each product (*e.g.,* fabric composition, color choice, print design, and trim scheme), Seckinger supplied her aesthetic input to Triboro, who performed the actual labor involved in creating a product design that coordinated with Luve's bath blankets.  Below is an example of one such co-opted product, a sponge-like toy called a "Bath Buddy."



The evidence will show that well before Luve entered into the ELA with Triboro at least Pottery Barn, *inter alia*, was promoting and selling bath toys that approximated the *same* animal motifs (frogs, ducks, *etc.*) Luve later used in the design of its bath blankets and comprised the *same* sponge-like material as the Luve Bath Buddies.[4]   In other words, Luve's frog and duck "Bath Buddies" are little more than Seckinger's co-opting of Pottery Barn's frog and duck "Tub Toys."

_____

[4] Luve contends that it owns rights to the Bath Buddy products and that, like its bath blanket contentions, the public-at-large (including Triboro) infringes Luve's rights by making similar bath toys.  Such contentions are meritless.  There was no basis at law for Luve's assertion of exclusive rights to a product idea existing in the public domain before its patent application was rejected and certainly none now— especially an idea that Luve simply copied and reformatted to resemble another non-novel product in the public domain (*i.e.,* the bath blanket).

Even though towels, wash-cloths, robes, slippers, and bath toys (*e.g.,* Bath Buddies) were
<u>not</u> subject to the ELA, Triboro <u>still</u> paid Luve a 5% royalty on all sales of every such product
for which Luve contributed to the product design.  Thus, Luve has been paid (and continues to be
paid) a 5% royalty on all products manufactured by Triboro branded with the BATH LUVE®
mark.

Indeed, despite the fact that Luve does not own exclusive rights to any bath products at
issue as a matter of black-letter law (*including* the bath blankets, Bath Buddies, bath robes, *etc*.),
Triboro has paid Luve a 5% royalty on <u>all</u> products that Triboro was not already making and
designing prior to doing business with Seckinger. This includes all Bath Buddy-like products
sold via other brands, regardless of whether or not they resemble one of Seckinger's co-opted
designs.[5]  At the same time, Triboro does <u>not</u> pay Luve any compensation for Triboro's sale of
products that Luve did not assist in designing and, moreover, <u>that Triboro has been
manufacturing and supplying to retailers for several years prior to Luve's existence</u> (*e.g.,* towels,
wash-cloths, robes, and slippers).

**C.    Luve's Patent Application Is Rejected by the U.S. Patent Office**

The U.S. Patent Office ultimately and finally rejected the patent application that was the
subject of the ELA because it did not contain any patentable material.   Among other fatal
deficiencies, the Patent Office  found that the claimed invention (*i.e.,* the baby blanket known as
the "Bath Luve") had been shown in patents already issued to others before Luve created the
Bath Luve product and, as such, Luve's patent application did not meet the novelty requirement
of 35 U.S.C. § 102.   The application's final rejection is currently on appeal before the Board of

---

[5] Triboro did <u>not</u> pay Luve the Bath Buddy royalty because of any existing contractual obligation (*e.g.,*
the ELA) or because Luve owned any (actual or potential) intellectual property rights to the Bath Buddy
(as it was simply a redesigned knockoff of a Pottery Barn bath toy).  Instead, the royalty was paid as
compensation for Luve's assistance in sourcing the toy as a potential addition to the bath blanket product
line.

Patent Appeals.  The ultimate outcome of the appeal is the only reason Triboro has not elected to terminate the ELA pursuant to ELA § 12.2.2, which permits Triboro to terminate under such conditions.  Until Luve achieves a favorable outcome on appeal, Luve has no proprietary rights to enforce against the general public (including Triboro) regarding the manufacturing, use, and sale of the bath blanket.

### D.     The Instant Litigation

On July 17, 2009, Luve notified Triboro of its purported breach of ELA §§ 7.1, 7.2, and 12.2.4.  *See Dkt.* 65-26.  To protect its interests in continuing to operate under the ELA, Triboro responded on August 10, 2009, and informed Luve it had cured its purported breaches of the ELA.  *See Dkt.* 65-27.  Triboro and Luve thereafter continued to operate per the terms of the ELA, with Triboro paying 100% of all the required royalties and Luve accepting the same.

On February 2, 2010, the U.S. Patent Office rejected Luve's patent application, notifying Luve that its claimed "invention" was not novel and actually disclosed in several other patents.

On April 19, 2010, Luve sent Triboro a second termination letter, again alleging breaches of ELA §§ 7.1, 7.2, and 12.2.4 as well as § 3.2.4.  *Dkt*. 65-30. The letter purported to revoke Triboro's "right" to make the unpatented bath blanket and "instructed [Triboro] to immediately stop all manufacturing, marketing and sales" of bath blankets, deeming any such acts "infringement."   In other words, upon receiving a formal *rejection* of its patent application, Luve demanded that Triboro operate as if Luve now owned patent rights.

On April 30, 2010, Triboro initiated suit against Luve alleging, *inter alia*, breach of the ELA via wrongful termination thereof.  *See Dkt*. 1.

On September 16, 2010, Luve appealed the rejection of its patent application to the Patent Trial and Appeal Board.

On September 29, 2010, Luve filed Counterclaims claiming, *inter alia*: (i) breach of the ELA; (ii) misappropriation; (iii) conversion; and (iv) unjust enrichment.  *See Dkt*. 9.

On April 8, 2013, despite Luve *never* having owned any rights enforceable against the public at large (including Triboro) for any product, Luve disclosed its alleged damages (*see Dkt*. 75-6) to Triboro, alleging "economic damages" resulting from Triboro's sale of the bath blanket in excess of "$2,738,490 in two categories: $1,377,829 for lost historic profits and $1,360,661 for Luve's lost future opportunities."  *Id*. at 16.  Luve's basis for concluding that it suffered $2,738,490 in damages (inclusive of "Triboro's incremental profits" for all-post-termination sales) fails to explain, *inter alia*, (i) *how* Luve could have been damaged by Triboro's alleged breaches when it is uncontroverted that Luve has been paid all royalties due under the ELA (and additional monies not even required by the ELA); and (ii) *how* Luve can be "damaged" for post-breach sales of an unpatented product.

Further, Luve has <u>never</u>, via expert report or any other disclosure, disclosed any damage calculations or disclosures concerning its misappropriation, conversion and unjust enrichment claims.  Instead, Luve included a table concerning its damage demand at trial in the Joint Pretrial Order.  *See Dkt*. 89, at 28.  This standalone table, which does not include its underlying data, methodology, or analysis, claims $21,894,791.52 in damages to Luve, LLC, a sole-proprietor start-up without any intellectual property rights recognized by law, whose *gross* revenue for its entire eight-year existence is less than $200,000.

## III.  <u>CAUSES OF ACTION</u>

### A.  **Luve Cannot Prove Any Damages Resulting From Breach of Contract**

Luve seeks to recover damages from Triboro for breach of the ELA.  Triboro generally admits to technical noncompliance with the ELA, but the evidence will show that Luve was not damaged by any purported breach of the ELA and continues to accept its royalty payments.

1.  **The ELA Does Not Require Triboro to Maximize Sales of a Specific Brand of Bath Blanket or Maximize the Value of a Trademark (§§ 6.1, 12.2.4)**

<u>First</u>, Luve claims that the ELA required Triboro to use commercially reasonable efforts to maximize the sale of Bath Luve-branded bath blankets pursuant to ¶ 12.2.4 so as to maximize the value of Luve's "BATH LUVE" trademark pursuant to ¶ 6.1.[6]  Luve's claim is meritless because, *inter alia*, Luve is cherry-picking parts of two separate and unrelated contract terms and combining them to create a *new* obligation that is inconsistent with the express rights and privileges elsewhere in the ELA that are intended protect Triboro against just such a claim.

Section 12.2.4, which is found under the heading "Term/Termination," states:

"<u>Termination by Luve</u>. Anytime after the second year for failure by Triboro to **use commercially reasonable efforts to maximize sale of Licensed Products.**"

ELA § 12.2.4 (emphasis added).

Section 6.1, in turn, which is found within the ELA section concerning "Protection of Trademarks." states *in toto*: as follows:

"<u>Prosecution of Licensed Mark</u>. Luve hereby vests in Triboro sole and exclusive control, obligation, and responsibility for the filing, prosecution (including appeals, opposition/cancellation proceedings and appeals thereof) of the Licensed Mark, using counsel selected by Triboro. The obligation to prosecute the Licensed Mark is limited by paragraph 12.2. The prosecution of the Licensed Mark is at Triboro's sole discretion as to how best prosecute the application to the extent such protection is in **the party's joint goal of maximizing the value of the Licensed Mark.** Luve shall cooperate with all reasonable requests from Triboro or its counsel in manners relating to these activities. The costs associated with all such activities and any costs associated with maintenance of the Licensed Mark (including any renewal fees and maintenance fees) shall be Shared Expenses for filings of the Licensed Mark in U.S. and Canada. The costs associated with all such activities and any costs associated with maintenance of the Licensed Mark (including any renewal fees and maintenance fees) anywhere else in the world, except the U.S. and Canada, shall not be Shared Expenses."

*Id.* (emphasis added).

---

[6] Luve's contentions, in short, are that Triboro breached §§ 6.1 and 12.2.4 because "Triboro was obligated to maximize the value of the licensed Mark under the ELA, […] [but] Triboro wasn't trying to maximize the Licensed Mark, and instead was trying to maximize sales of the product under any brand." *Dkt.* 65, Luve Summary Judgment Motion, at 24-25 (citations omitted).

Here, Luve has combined the bolded/underscored half-sentences in two different sections relating to entirely unrelated obligations to allege Triboro breached a supposed obligation to maximize the value of the Luve trademark rather than the Licensed Product.  This claim, however, is unsupported by the express terms of the ELA and black letter contract law.

Section 12.2.4 merely provides a basis for termination if a condition precedent is met after a given time frame and does not affirmatively obligate either Luve or Triboro to take any specific action or receive any damages if action is not taken.  As for § 6.1, that provision does not:  (a) affirmatively obligate Triboro to maximize the value of the Luve trademark; (b) use the Luve trademark to sell bath blankets or (c)  prohibit Triboro from selling the bath blankets under different trademarks.  Indeed, if § 6.1 were read to impose such an obligation, that interpretation would unacceptably render § 6.2 of the ELA meaningless.

Under New York law, a contract "should be construed so as to give full meaning and effect to <u>all</u> of its provisions."  *LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp.,* 424 F.3d 195, 206 (2d Cir. 2005) (emphasis supplied). "[A]n interpretation of a contract that has the effect of rendering at least one clause superfluous or meaningless [...] is not preferred and will be avoided if possible[...].  Rather, an interpretation that gives a reasonable and effective meaning to <u>all</u> terms of a contract is generally preferred to one that leaves a part unreasonable or of no effect."  *Galli v. Metz*, 973 F.2d 145, 149 (2d Cir.1992); *see also Columbus Park Corp. v. Department of Hous. Pres. & Dev.,* 80 N.Y.2d 19 (1992) ("[A] construction which makes a contract provision meaningless is contrary to basic principles of contract interpretation.").

Moreover, if the parties had meant for Triboro to sell only Bath Luve-branded bath blankets so as to maximize the value of Luve's trademark, they could have easily crafted and included language to that effect as well as removed language that granted Triboro <u>sole</u>

discretion[7] to sell bath blankets under any brand name that would generate the most royalty value for Luve.

Luve also cannot satisfy the damages element of this claim.  ELA § 6.1 provides for Luve to receive a trademark registration (and there is no dispute that Luve has received a trademark registration for the mark BATH LUVE) and ELA § 12.2.4 states by its express terms that the only relief for any alleged failure by Triboro to use commercially reasonable efforts is the termination of the ELA and loss of the license.

Finally, the evidence will show that Triboro used commercially reasonable efforts to maximize sale of bath blankets (*i.e.,* Licensed Products) by placing them in several national retailers and generating millions of dollars in sales.

### 2.  Luve Cannot Prove Any Damages Related to Two Inadvertent Marking Omissions as Required by ELA § 7.2

Second, Luve claims that Triboro breached ¶ 7.2 of the ELA when it did not manufacture all bath blankets with at least two markings, namely: (i) the term "Patent Pending" and (ii) the words "Licensed by Luve LLC."

Section 7.2, under the heading "Additional Obligations," states:

> "Marking. Triboro shall suitably mark or cause to be marked all containers and packages of any Licensed Product and shall fix or cause to be fixed on some conspicuous part of every such Licensed Product where appropriate, a stamped plate or other method of marking containing the relevant U.S. Patent Number or Patent Pending, whichever is appropriate. Triboro shall suitably mark or cause to be marked and use the Licensed Mark, as appropriate. Further, Triboro shall mark the Licensed Product with an indication that the patent is licensed from Luve."

*Id.* (emphasis added).

The ELA requires Triboro to mark all bath blankets with "Patent Pending" until the U.S. Patent Office makes a final determination regarding Luve's patent application, and Triboro

---

[7] "Triboro Marks.  Triboro shall, in its sole discretion, select the brand names, slogans, trade dress or other indicia of origin to be used in connection with the sale of Licensed Products thereon."  (*See* ELA § 6.2.)

concedes it inadvertently failed to mark two such bath blanket products.  Section 7.2, however, does not require Triboro to mark any products as "Licensed by Luve LLC" before Luve receives an actual patent.  Further, marking products with an indication that "a patent is licensed from Luve" before Luve is granted a patent is not only misleading, but illegal per 35 U.S.C. § 292(a).[8] In addition, Luve did not suffer any damages by Triboro's inadvertent failure to mark two products with "Patent Pending" after Luve's patent application was rejected the U.S. Patent Office, because the marking serves only as notice to potential infringers that they *may* be liable for damages if a patent later issues.  Here, not only is there no evidence of the two unmarked products being copied, but the rejection of the patent application renders such notice superfluous.

### 3.    Luve Cannot Prove Any Damages Pursuant to ELA § 7.1 Deriving From Lost Opportunities to Review Certain Products Prior to Their Sale

Third, Luve claims that Triboro breached ¶ 7.1 of the Licensing Agreement when it did not send product samples to Luve for "review and discussion" prior to selling them.

ELA § 7.1, which is found under the heading "Additional Obligations," states:

"7.1 Marketing and Sales. Triboro, at its sole discretion, shall manufacture, market, distribute and sell the Licensed Product, including selecting any trademarks or copyrightable materials to use in connection with such products, the design, merchandising and packaging of such products and ensuring quality control. Luve shall be sent samples of the product, packaging and promotional material for review and discussion with Triboro. The final determination of product, packaging and promotional material shall rest solely with Triboro."

*Id.*  Triboro did not send Luve all samples of the product, packaging and promotional material to Luve to review for all bath blanket products. Luve, however, did not suffer any damages on account of this failure as it was paid a royalty for all bath blankets sold by Triboro.

---

[8]  35 U.S.C.  § 292(a) states, in relevant part, that "[w]hoever marks upon, or affixes to, or uses in advertising in connection with any unpatented article the word 'patent' or any word [. . .] importing the same is patented [. . .] [s]hall be fined not more than $500 for every such offense."); *Chamilia, LLC v. Pandora Jewelry, LLC,* No. 04-CV-6017 (KMK), 2007 WL 2781246, at *10 (S.D.N.Y. Sept. 24, 2007) (claiming a product is patented when it merely had a patent pending violates 35 U.S.C. § 292 when such claim is used in advertising).

4.   **Luve Cannot Prove Any Damages Resulting From Non-Receipt of Some Marketing Reports Required by ELA § 3.2.4**

<u>Fourth</u>, Luve claims that Triboro breached ¶ 3.2.4 of the Licensing Agreement when it did not send sales and marketing reports to Luve every quarter.

Section 3.2.4, found under the heading "Consideration/Payments/ Cost Sharing," states, in relevant part:

> "Reporting. Within 30 days of the end of each quarter, Triboro shall provide a report setting forth the royalty due for the particular royalty period, the amount actually paid to Luve and the amount for payment of Shared Expenses. […] A separate report will be prepared at the same time setting forth Luve's unpaid portion of the Shared Expense account. That report will also reflect all related activity for the period including the opening balance in the account, royalty payments withheld during the period, amounts withdrawn for payment of Shared Expenses and the balance remaining due from Luve for Shared Expenses at the end of the period **as well as an updated sales and marketing report** […]."

*Id.* (emphasis added).  Thus, the ELA requires Triboro to send marketing reports to Luve every quarter.  The evidence will show that Triboro initially complied with § 3.2.4, but stopped when Luve objected to the reports' format and ignored Triboro's requests to identify a desired format. Luve has not shown how it was damaged (or even could be damaged) by not receiving reports. In any event, Triboro paid Luve all royalties due on every product licensed by the ELA, as well as the additional products described above for which it was not obligated to pay any royalties.

**B.   Luve Cannot Sustain a Claim for Misappropriation**

Luve claims Triboro misappropriated its idea for the Better Bath Line and misappropriated all of its products after the April 2010 termination.[9]  Under New York law, to prevail on a claim for misappropriation of an idea, Luve must satisfy two elements:  (i) a legal

---

[9] Luve's Answer and Counterclaims only claim misappropriation of the Better Bath Line.  *See Dkt.* 9 at ¶¶ 32-39.  This claim was further addressed as limited to "Triboro's alleged misappropriation of Luve's idea for the Better Bath Line" in the Joint Pretrial Order.  *See Dkt.* 89 at 10, n. 1.  However, Luve's proposed jury instructions expand this claim to capture sales of an unknown and undisclosed number of products after April 2010.  *See Dkt.* 125 at 38.  This tactic is part of Luve's effort to reformulate a new damage analysis in light of the Court's prior decision striking the report of Luve's economic damages expert under *Daubert*.  *See Dkt.* 86.

relationship existed between the parties; and (ii) the idea disclosed is novel.  *See Zikakis v. Staubach Retail Servs., Inc.*, No. 04 CIV. 9609 (NRB), 2005 WL 2347852, at \*3 (S.D.N.Y. Sept. 26, 2005); *McGhan v. Ebersol*, 608 F. Supp. 277, 284 (S.D.N.Y. 1985).

        1.      **Legal Relationship**

For there to be a legal relationship, the parties must have had a confidential relationship or a relationship based on a contract that covers the idea for the Better Bath Line.  *See Faiveley Transp. Malmo AB v. Wabtec Corp.,* 559 F.3d 110, 117 (2d Cir. 2009) ("To succeed on a claim for the misappropriation of trade secrets under New York law, a party must demonstrate [...] that the defendants used that trade secret in breach of an agreement, confidential relationship or duty, or as a result of discovery by improper means.").

 Here, the parties had a confidential relationship governed by the ELA insofar as it concerns the communication of Luve's "ideas" to Triboro.  Indeed, the parties agreed to express terms governing the transfer of such information, *e.g.*, ELA § 1.2:

> "<u>Confidential Information</u>" shall mean all non-public information disclosed or provided by one party to the other including without limitation trade secrets processes techniques drawings models customer-related information and data computer programs databases business plans technical data product ideas marketing data contracts and financial information that if disclosed: (i) in tangible form is marked Confidential Proprietary or a similar legend; or (ii) orally, is stated by the Disclosing Party to be confidential and confirmed to be confidential in writing within twenty (20) days of such disclosure."

Luve must concede at trial, however, that it **never** once disclosed to Triboro any "idea" at issue per the terms and conditions required by ELA § 1.2.

The requirement to mark information as "Confidential" was vital to the contract.  It was specifically included to ensure the recipient was aware of what the disclosing party considers confidential and places the recipient on notice that § 1.2 applies.  In the absence of such marking, there is no basis or reason for the recipient to grant any special handling of the information.

Except for the bath blanket, Triboro will establish at trial that **all** of Luve's "ideas" for the Better Bath Line were nothing more than the co-opting of third-party products (*e.g.*, Pottery Barn's Tub Pals) and Luve's cherry-picked design suggestions (*e.g.*, fabric composition, color choice, print design, and trim scheme) as to how such products could be coordinated to existing products. Other than that, Triboro did not use or rely upon any "idea" from Luve that was not already known to the general public, known in the trade, or made by Triboro prior to encountering Seckinger and Luve.

2.       **Luve Cannot Satisfy the Novelty Requirement**

Novelty of an idea is an essential element of the tort of misappropriation and Luve bears the burden of showing the Better Bath Line was a novel and original idea. *See Zikakis*, at *3 (S.D.N.Y. Sept. 26, 2005) *citing Downey v. General Foods Corp.*, 31 N.Y.2d 56, 61 (1972) ("[W]hen one submits an idea to another, no promise to pay for its use may be implied, and no asserted agreement enforced, if the elements of novelty and originality are absent, since the property right in an idea is based upon these two elements.").  To determine whether an idea is novel, a court must consider what was already in the public domain at the time the idea was disclosed to the alleged misappropriator.  *Id*.   A protectable idea must reflect "genuine [...] invention, and not a merely clever or useful adaptation of existing knowledge."  *Id.*  An idea that is merely "a variation on a basic theme" available in the public domain is not novel.  *Id.*; *see also Marraccini v. Bertelsmann Music Group I*nc., 644 N.Y.S.2d 875, 877 (3d Dep't 1996) (holding that idea that is a "creative variation on [an already public] theme" is not subject to the tort of misappropriation*); Educational Sales Programs, Inc.,* 317 N.Y.S.2d 840, 844 (Sup. Ct. 1970) ("Improvement of standard technique or quality, the judicious use of existing means, or the mixture of known ingredients in somewhat different proportions-all the variations on a basic theme-partake more of the nature of elaboration and renovation than of innovation.").

Here, Luve claims Triboro used Luve's idea for creating the Better Bath Line to compete against Luve by manufacturing and packaging nearly identical products after Triboro declined to manufacture the Better Bath Line.  Luve's claim is meritless on its face.

First, the "Triboro-stole-my-novel-idea" narrative of Luve's claim is demonstrably false. Luve's principal contends that the Better Bath Line consisted of: burp cloths, washcloths, bath towels, hooded towels, blankets, robes, slippers, and bath blankets.  Like the determination of the objective examiner in connection with the patent application for the bath blankets, none of these products can be deemed novel as all are well-known in the trade and have been for years.  For instance, Luve's idea to include a "hooded towel" (also known as a puppet towel) in the Better Bath Line derived from Pottery Barn, as shown below:



The evidence will further show that Luve's "ideas" regarding the other above-named products did not involving transforming existing washcloths, blankets, or robes into something completely new to the market, but merely comprised adapting such existing products to coordinate with the existing Bath Luve line. For instance, Luve claims that Triboro misappropriated Luve's idea for its Bath Buddies toys. However, again, Luve copied the "idea" for the Bath Buddies from Pottery Barn. Pottery Barn's terrycloth toys (left) and Luve's terrycloth toys (right) are shown below:



Indeed, the evidence will show that all of the products at issue (including bath blankets)[10] were known to the public at least as early as April 2010.

Second, even if the idea for the Better Bath Line was novel and original, Luve specifically granted Triboro a license to "use and exploit" any "Related Works" supplied by Luve for no additional royalties in ¶ 2.3 of the Licensing Agreement.

Third, Luve's pleadings admit that Luve never marketed a Better Bath Line to anyone. Therefore, Triboro cannot unfairly compete against Luve so as to damage it until Luve begins marketing a line to compete with Triboro's allegedly misappropriated line.

### C.    Luve Cannot Sustain a Claim for Conversion

Luve's third claim is for the alleged conversion of a proprietary idea.  A party commits conversion when it, without authority, intentionally exercises control over the property of another and thereby interferes with the other person's right of possession.  *Pure Power Boot Camp, Inc. v. Warrior Fitness Boot Camp, LLC*, 813 F. Supp. 2d 489, 535 (S.D.N.Y. 2011). The defendant's interference with the property must be to the exclusion of the plaintiff's rights

---

[10] Specifically, (i) Luve authorized sales of the bath blankets to the public prior to April 2010;   (ii) Luve has never possessed patent rights; and (iii) none of Luve's alleged ideas for the Better Bath Line were protected by any intellectual property laws before April 2010 (or after). Thus, all such products and ideas are and remain public domain such that Triboro can be afforded no lesser rights than the public at large as a matter of law.  *See Seaweed, Inc.,* 219 F. Supp. 2d at 555 ("Patent rights vest only upon issuance, and are not retroactive.").   In other words, post-ELA Luve cannot claim rights for its ideas *superior* to Triboro, but *inferior* to the public at large.

and the damages asserted must be no greater than the value of the property converted.  *Id.*  Luve claims Triboro used Luve's product idea for the Better Bath Line to create nearly identical products, thereby interfering with Luve's use of those ideas.  The burden of proof is on Luve to show that Luve possessed exclusive ownership and control of the product idea information for the Better Bath Line and that Triboro interfered with Luve's ownership and control of that information.  For several reasons, Luve cannot sustain its burden.

First, Luve's conversion claim fails as a matter of law because a claim for conversion under New York law cannot be based on an intangible idea.  *Ferring B.V. v. Allergan, Inc.,* 4 F. Supp. 3d 612, 630-31 (S.D.N.Y. 2014).

Second, the evidence will show that, aside from the bath blanket, Luve did not supply Triboro with any information that was not already known to Triboro or known and available to the public at large (*i.e.,* Triboro did not take any "property" over which Luve could validly claim possession).  Further, Triboro did not interfere with Luve's ability to commercialize its ideas, but, instead, Luve predictably failed to find a market for ideas co-opted from other merchants.

Third, the evidence shows that Luve was never "excluded" from its Better Bath Line idea and could have manufactured those products at any time either alone or through another manufacturer.

### D.   Luve Cannot Maintain a Claim for Unjust Enrichment

To prevail on a claim for unjust enrichment, Luve must prove that Triboro obtained money or a benefit under such circumstances that, in fairness and good conscience, the money or benefit should not be retained.

Luve claims Triboro was unjustly enriched at Luve's expense in that Triboro used information Luve shared with it about Luve's Better Bath Line and packaging to develop its own products.  Triboro, however, did not use any information proprietary to Luve and Luve's

information about the Better Bath Line was not novel or original, but was known to the public and the trade.   In short, Luve will be unable to prove Triboro *unjustly* benefited from Luve's information because it will be unable to prove that Luve benefited at all.

### E.    Triboro's Breach of Contract/Wrongful Termination Claim

Triboro's Complaint seeks a determination that, as discussed *supra*, Luve did not have a valid basis to terminate the ELA.  As such, to the extent that Triboro receives a verdict that it did not materially breach the ELA, the Court should enter judgment in favor of Triboro finding that Luve wrongfully terminated same.  Triboro has already indicated in its proposed jury instructions and subsequent submissions to the Court and Luve's counsel that it is not seeking monetary damages in this action.

## IV.    LUVE CANNOT PROVE ANY DAMAGES

Finally, as set forth in Triboro's motion in *liminie* (Dkts 117, 118), all of Luve's claims fail because it has failed to set forth any cognizable claim for damages.

Luve's sole damages disclosure was contained in its expert report submitted on April 8, 2013.  That report alleges Luve suffered "economic damages" on its contract claim resulting from Triboro's sale of the bath blanket in excess of "$2,738,490 in two categories: $1,377,829 for lost historic profits and $1,360,661 for Luve's lost future opportunities." *Id*. at 16.

On March 8, 2014, the Court struck Luve's expert report as unreliable per *Daubert. See Dkt.* 86. Luve has not served Triboro with a revised report or any other supplemental damage calculation or disclosure.

### A.    Rule 26 Bars Luve From Presenting an Unsupported, Deficient Damage Claim

Moreover, Luve has <u>never</u>, via expert report or any other disclosure, disclosed any damage calculations or disclosures concerning its misappropriation, conversion and unjust

enrichment claims.  Nevertheless, Luve included the below table concerning its damage demand

at trial in the Joint Pretrial Order as to Triboro's alleged misappropriation.  *See Dkt*. 89, at 28:

| Product Type | Gross Sales | Gross Margin | Net Amount |
|---|---|---|---|
| Valboa Blankets | $18,158,928.00 | 52% | $9,442,642.56 |
| Better Bath Line | $11,662,552.00 | 52% | $6,064,527.04 |
| Total | | | $15,507,169.6 |

The method of calculation used by Luve as well as the data used to generate the table (including

its source), remain a mystery to Triboro.  Indeed, the table suffers from the same flawed data

underlying the expert projection of damages that the Court found unreliable (*i.e.,* a grossly

inaccurate "gross margin" basis attributable to Triboro that is demonstrably fictitious).[11]  Luve

also relies on the same fictitious gross margin figure in a second table concerning its damage

demand at trial for Conversion Claims/Unjust Enrichment Claims:

| Product Type | Gross Sales | Gross Margin | Net Amount |
|---|---|---|---|
| Valboa Blankets | $18,158,928.00 | 52% | $9,442,642.56 |
| Better Bath Line | $11,662,552.00 | 52% | $6,064,527.04 |
| Profits Off Luves | | | $2,738,490.00 |
| Total | | | $18,245,659.6 |

The above damage calculation bears no relation to any known or commonly accepted basis for

calculating damages relative to a successful conversion claim (which, as stated above, can be no

greater than the value of the converted property) or unjust enrichment claim (which is "restricted

to the reasonable value of the benefit conferred upon the defendants" and "measured by a

defendant's unjust gain, rather than by a plaintiffs loss." *Pure Power*, 813 F.Supp.2d at 534).

Here, while the $2,738,490 calculation in the "Profits off Luves" calculation appears to derive

from Luve's deficient damage report, Luve has never set forth its method of calculation or the

---

[11]   Luve's Expert, Mr. Don Smith, was deposed at length regarding the gross inaccuracy of this Gross
Margin calculation.  *See Dkt*. 80, Triboro Motion to Strike, at 7-8.

data used to generate the table.  Indeed, the "Valboa Blankets" item is the <u>first</u> such notice in this

case that Luve was claiming rights to Valboa blankets or that Triboro misappropriated same.[12]

Finally, Luve includes a third table in the Joint Pretrial Order purporting to be a

"Compilation of Damages Sought by Luve":

| Cause of Action | Damages |
|---|---|
| Misappropriation | $15,507,169.60 |
| Conversion | $18,245,659.60 |
| Breach of Contract | $2,738,490.00 |
| Unjust Enrichment | $18,245,659.60 |
| Attorney Fees | $750,000.00 through trial |
| Pre-Judgment Interest | $3,649,131.92 |
| **Total Damage Exposure (after election)** | **$21,894,791.52** |

This table, and every number recited therein (but for the Breach of Contract calculation parroted

from the expert report), constitutes the first and only such disclosure of this data to Triboro.

Notably, no data, methodology, or analysis is provided as to how Luve contrived almost

<u>$22 million</u> in damages as a sole-proprietor start-up whose *gross* revenue for its eight-year

existence has yet to exceed even 1% of that amount (*i.e.,* less than $200,000).   Instead, Luve

proffers only the following explanation in the Joint Pretrial Order:

> "The method of calculation is taking the historical sales data provided by
> Triboro's own internal financial records produced in discovery from products that
> composed the [sic] better bath line as set forth in Luve's pleadings and the profit
> margins that Triboro's own financial records claim that it achieved on those same
> products and performing a simple mathematical calculation of gross sales times
> profit margin to result the in the above stated amounts."  *See Dkt*. 89, at 29.

Luve's proffer is thereby nearly identical to that offered by the plaintiff, and rejected by the

Second Circuit, in *Design Strategy, Inc. v. Davis,* 469 F.3d 284, 293 (2d Cir. 2006); *See also*

*Murray v. Town of Stratford*, 2014 WL 3700982, at *10 (D. Conn. July 25, 2014).   There,

Design Strategy, Inc. ("Design") did not provide "any specific computation of lost profits nor

[did it] provide[ ] any evidence on the basis of which such computation [of lost profits] might be

---

[12] Valboa is a low pile, faux fur micropolyester fabric pervasively used in the trade.

made." *Id.*   The district court ruled that Design's failure to abide by Fed.R.Civ.P. 26(a)(1)(c) meant that the evidence of lost profits would not be admissible. *Id.* Design objected, claiming that "it had, in fact turned over evidence from which a computation of damages could be made— its financial records[,]" and that "it was not obligated to provide a calculation of damages because of the calculation of damages from these records would be 'simple arithmetic.'" *Id.* The district court held, however, that the reality "is quite the opposite[,]" and informed Design that "saying that you provided documents to the defendant doesn't go far enough in meeting your burden of proof on this issue[,]" and constitutes a failure to comply with Rule 26(a). *Id.* at 293– 95.   Affirming the district court, the Second Circuit explained, "by its very terms Rule 26(a) requires more than providing—without any explanation—undifferentiated financial statements; it requires a 'computation,' supported by documents." *Id.* at 295.

Here, Luve's damage disclosure is even more deficient than the one rejected by the Second Circuit in *Design Strategy* since Luve has failed to identify or disclose any of the documents or information used to calculate the damage demand.   Indeed, Luve fails to identify what "historical sales data" was used beyond *generally* stating that it derives from any number of "Triboro internal financial records" produced during discovery.   Moreover, Luve fails to identify the precise products whose "historical sales data" Luve elected to use to calculate Luve's damages beyond identifying it as "composed [by] the [sic] better bath line as set forth in Luve's pleadings."[13]   Finally, Luve fails to identify how it derived the profit margin used to generate the "simple mathematical calculation of gross sales times gross margin" to derive the damages it will ask the jury to award at trial.   In sum, Luve has failed to comply with Rule 26(a) by virtue of its continuing failure after five years of litigation to provide a computation of damages.

---

[13] This statement is nonsensical, which only further confuses the issue.   There is no dispute that Triboro declined to produce the Better Bath Line, therefore there were no Triboro sales of products that "composed the Better Bath Line" and, thus, no historical sales data.

**B.      Luve's Damage Theories Are Inherently Deficient and Legally Defective**

Rule 26(a) disclosure deficiencies aside, Luve's damage calculations for each of its four claims are simply wrong as a matter of law and logic and bear no rational relation to the harm Luve alleges it has suffered, nor the remedies prescribed by law to make Luve whole.

In order to recover damages, a claimant must present evidence that provides the finder of fact with a reasonable basis upon which to calculate the amount of damages.  It need not prove the amount of loss with mathematical precision; but the jury is not allowed to base its award on speculation or guesswork.  Lost profits, though typically "difficult to prove with exactitude," may be recovered "to the extent that the evidence affords a sufficient basis for estimating their amount with reasonable certainty." *Gargano v. Heyman,* 203 Conn. 616, 621, 525 A.2d 1343, 1346 (1987); *see also Conaway v. Prestia,* 191 Conn. 484, 493–95, 464 A.2d 847, 852–53 (1983); *Burr v. Lichtenheim,* 190 Conn. 351, 460 A.2d 1290, 1295–96 (1983).

Here, Luve's calculations are premised on a damages theory that Luve can only be made whole by an award of Triboro's entire profit (as calculated by Luve) on: (i) all bath blankets sold by Triboro after Luve terminated the ELA and (ii) all products sold by Triboro that incorporate, in whole or in part, Luve's amorphous, undocumented, and unsubstantiated "ideas" for the Better Bath Line.  Such calculations are therefore inherently defective and cannot be presented to a jury as a basis upon which to ascertain Luve's damages with any reasonable degree of certainty.

First, Luve's intends to ask the jury to award Luve 100% of the profits derived from Triboro's sale of all products at issue, however, there is no known precedent for such an outrageously excessive award, which would literally grant Luve damages on its secondary claims that are far, *far* in excess of any award granted to a litigant who successfully prevailed on, *inter alia*, a valid patent claim (which Luve did not plead). Indeed, such a theory goes *well* beyond simply granting Luve enforceable rights (*i.e.,* a *de facto* patent) for an "idea" that the U.S. Patent

Office determined to be non-novel and public domain.  It quite literally compensates Luve as if Luve were an *exclusive rights holder*, which it cannot be considered as a matter of law. Moreover, it cannot be overlooked that Luve did not <u>gain</u> any rights by "licensing" a product (the bath blanket) to Triboro that has now been deemed unpatentable as non-novel, public domain, and previously disclosed in several expired third-party patents.  Therefore, by logical extension, Triboro did not <u>lose</u> any rights via Luve's purported termination of the "license." Thus, Triboro cannot be *retroactively* placed in a position whereby an ELA Triboro *did not need* to make the product in the first place somehow places it in a *lesser* position than the public-at-large such that it (and it alone) owes Luve 100% of the profits earned for a product that the rest of the planet can sell at-will.  Indeed, as the bath blankets primarily at issue only comprised about $3 million in total sales, Luve's damage calculation of $21,894,791.52 must necessarily include an unknown number of other, additional products in the public domain (*e.g.,* Valboa blankets) for which Luve, per mere *ipse dixit*, claims exclusive rights and demands 100% of Triboro's profits.

<u>Second</u>, Luve calculates Triboro's profit by (apparently) performing a "simple mathematical calculation of gross sales times gross margin" using (i) the gross sales data for an *unspecified* number of Triboro products during an *unspecified* period of time and (ii) a gross margin calculation derived out of thin air (*i.e.,* Triboro's gross margin is a fraction of the 52% stated by Luve).[14]  This amorphous methodology cannot render to a jury any fair and just number with any degree of reasonable certainty.

At the end of the day, regardless of Luve's 11th hour, unsupported and grossly exaggerated damage analysis, the evidence will show that Luve has been paid <u>all</u> royalties due and payable under the ELA.  Thus, the evidence will ultimately show that Luve has not been compensably damaged by Triboro as a matter of law or equity.

---

[14] Luve did not depose any witness as to Triboro's gross margin (neither globally nor for any specific product or products).

**V.      CONCLUSION**

For the foregoing reasons, Triboro respectfully asserts that Luve cannot justly prevail on

any claims at trial.

Dated:  December 15, 2014                    Respectfully submitted,
          White Plains, New York

                                                  Paul Fields
                                                  Cameron S. Reuber
                                                  LEASON ELLIS LLP
                                                  One Barker Avenue, Fifth Floor
                                                  White Plains, New York 10601
                                                  Phone: (914) 288-0022

                                                  Russell M. Yankwitt
                                                  Craig M. Cepler
                                                  Yankwitt LLP
                                                  140 Grand Street
                                                  White Plains, NY 10601
                                                  Phone: (914) 686-1500

                                                  *Attorneys for Plaintiff Triboro Quilt*
                                                  *Manufacturing Corp.*

## <u>CERTIFICATE OF SERVICE</u>

I, Cameron S. Reuber, hereby certify that on December 15, 2014, a true and correct copy of the foregoing Plaintiff's Trial Brief was served by email via operation of the Court's ECF filing system, with a courtesy hard copy served via First Class Mail, postage-pre-paid, upon counsel for Defendant addressed as follows:

David Schiller
The Schiller Firm
2309 West Parker Road
Plano, TX 75023-7839
DavidS@schillerlaw.com

*Attorneys for Defendant LUVE LLC*

Cameron S. Reuber
LEASON ELLIS LLP
One Barker Avenue, Fifth Floor
White Plains, New York 10601
Phone: (914) 288-0022
Fax:  (914) 288-0023
Email: reuber@leasonellis.com